No. 75,566

OMI HOLDINGS, INC., *Plaintiff*, v. JOHN M. HOWELL, *Defendant*.

(918 P.2d 1274)

Opinion filed June 7, 1996.

*Byron L. Gregory*, of McDermott, Will & Emery, of Chicago, Illinois, argued the cause, and *Roger W. Wenthe* and *Michael S. Schachter*, of the same firm, and *Douglas M. Greenwald*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, and Professor *William E. Westerbeke*, of the University of Kansas School of Law, of Lawrence, were with him on the brief for the plaintiff.

*Jerome H. Eschmann*, of Ascough, Eschmann, Oyler, P.A., of Topeka, argued the cause, and *Bradley A. Winters* and *James W. Erwin* , of Thompson & Mitchell, of St. Louis, Missouri, were with him on the brief for the defendant.

The opinion of the court was delivered by

ABBOTT, J.: This case is before the court on three questions certified by the United States Court of Appeals for the Tenth Circuit pursuant to the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq*. The questions are:

I. "Whether Kansas law recognizes a civil cause of action for embracery against an expert witness who causes a civil jury case to end in a mistrial as a result of his contacts with jury members."
II. "Whether Kansas law recognizes a civil cause of action for negligence against an expert witness who causes a civil jury case to end in a mistrial as a result of his contacts with jury members."
III. "Whether Kansas law recognizes a civil cause of action for fraud against an expert witness in a civil jury case who has contacts with jury members and who either fails to reveal those contacts to, or attempts to conceal those contacts from, the court or the opposing party."

The questions basically ask whether Kansas recognizes a civil cause of action for embracery, negligence, or fraud against an expert witness who causes a mistrial as a result of contacts with jury members. Embracery is "[t]he crime of attempting to influence a jury corruptly to one side or the other, by promises, persuasions, entreaties, entertainments, *douceurs*, and the like." Black's Law Dictionary 522 (6th ed. 1990).

The facts are set forth in the certification order as follows:

"Plaintiff OMI Holdings, Inc., was the defendant in *Manildra Mill Corp. v. Ogilvie Mills, Inc.*, Case No. 86-2457-S, a complex and protracted case in the

United States District Court for the District of Kansas involving patent issues, alleged antitrust violations, and pendent state law claims. On March 4, 1991, a combined bench and jury trial commenced in the *Manildra* matter. After 18 days of testimony, a mistrial was declared due to conversations overheard between John M. Howell, one of plaintiff Manildra Milling Corporation's expert witnesses, and several members of the jury. OMI subsequently filed a motion for reimbursement of attorney fees incurred in the aborted trial. OMI's motion was denied by the trial court, which concluded that 'the conversation which resulted in a mistrial was partially the fault of the expert witness and partially the fault of the jurors who disregarded th[e] [trial] court's admonitions . . . ., *Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 782 F. Supp. 102, 103-04 (D. Kan. 1991).

"On March 25, 1993, OMI filed this action against Howell in the District Court of Shawnee County, Kansas. In Count I of its petition, OMI asserted a cause of action for embracery against Howell, alleging that Howell 'owed a duty to OMI to refrain from influencing or attempting to influence the acts of *Manildra* jurors in any manner other than through sworn testimony given in the presence of Court and the parties in the courtroom,' and further alleging that Howell violated this duty by participating in contacts with the jurors with the intention to influence or attempt to influence their decision. Appellant's append. at 4. In Count II of its petition, entitled "Negligence," OMI asserted that Howell violated a duty to use reasonable care to avoid contacting the *Manildra* jurors by participating in contacts with the jurors 'with knowledge or reason to know that his contacts would harm OMI, with the intention to influence or attempt to influence the decisions of the *Manildra* jurors to adopt Manildra's positions, and with knowledge or reason to know that his acts would violate the rules prohibiting contact between witnesses or attorneys and the *Manildra* jurors.' Appellant's append. at 5. In Count III of its petition, entitled "Fraud," OMI asserted that Howell failed to inform the trial court or OMI of his contacts with the *Manildra* jurors 'with knowledge that his omission to reveal these facts would cause the court and OMI to incorrectly believe that no such contacts had taken place.' Appellant's append at 6. OMI further asserted in Count III that it justifiably relied on Howell's silence by continuing to participate in the trial and 'needlessly incurring additional fees, costs and other losses.' *Id.*

"The case was subsequently removed from state court to the United States District Court for the District of Kansas upon diversity jurisdiction grounds. On May 12, 1993, Howell filed a motion to dismiss pursuant to Fed. R. Civ. P[roc]. 12(b) (6), claiming that OMI's petition failed to state a claim upon which relief could be granted. On September 8, 1994, the district court issued a memorandum and order granting Howell's motion. In it memorandum and order, the district court concluded that Kansas would not recognize a civil cause of action for embracery under the circumstances alleged by OMI. In support of this conclusion, the district court noted that the Kansas courts, in *Koplin v. Rosel Well Perforators, Inc.*, [241 Kan. 206,] 734 P.2d 1177 [1987], and *Hokanson v. Lichtor*, [5 Kan. App. 2d 802,] 626 P.2d 214 [1981], had previously rejected civil causes of action

for spoliation of evidence and for perjury. Noting the similarities between this case and *Koplin* and *Hokanson* (*e.g.*, the existence of other penalties for the alleged wrongful conduct, the concern for duplicative litigation), the district court concluded the Kansas courts would likewise reject a civil cause of action for embracery. In addition, the district court rejected the notion that section 18 of the Kansas Constitution's Bill of Rights could be used to create a cause of action for embracery. Finally, the district court rejected the argument that federal or state criminal statutes, which prohibit contact with jurors outside of open court, could be used to create a private cause of action. As for OMI's negligence and fraud claims, the district court concluded that both were 'back-door' efforts to bring a civil action for embracery. Moreover, the district court concluded there were no duties, under Kansas law, to exercise reasonable care in following a court's instructions to avoid communications with jurors outside of open court or to disclose embracery."

## I. EMBRACERY

In support of its position that Kansas should recognize the tort of embracery, OMI cites to the following cases: *Doan's Case* (*No. 2*), 17 Pa. D. & C. 521, 5 Pa. DR. 211 (1896); *Employers Insurance v. Hall*, 49 N.C. App. 179, 270 S.E.2d 617 (1980), *cert. denied* 301 N.C. 720 (1981); *LaBarre v. Payne*, 174 Ga. App. 32, 329 S.E.2d 533 (1985); *Trudell v. Heilman*, 158 Cal. App. 3d 251, 204 Cal. Rptr. 551 (1984).

In *Doan's Case* (*No. 2*), 17 Pa. D. & C. 521, the defendant attempted to influence members of a grand jury to insure that the grand jury would criminally indict two people the defendant wished to have indicted. 17 Pa. D. & C. at 521. Based on this conduct, the court found that the defendant could be held in contempt of court and indicted for a misdemeanor. The court stated in dicta:

"One who attempts to influence or prejudice a juror in the discharge of his office, incurs a threefold liability. He may be summarily punished by the court, or when not within the provisions of the statute, by indictment for contempt in interfering with the process and obstructing justice, he is indictable under the statute or at common law for embracery, or *he may be sued for damages by one who has suffered through his unwarrantable interference.*" 17 Pa. D. & C. at 521. (Emphasis added.)

OMI interprets this language as authorizing a civil cause of action against one who improperly influences the trial process resulting in a mistrial for money damages, including trial expenses

and attorney fees related to the first trial. Howell contends, however, that this highlighted clause in *Doan's* quoted above is not referring to and does not allow an embracery action. Instead, according to Howell, the clause is simply referring to the fact that a person injured by improper juror influence may sue the influencer and receive damages for malicious prosecution, false imprisonment, defamation, or any other civil action recognized at the time. Howell argues that this clause in *Doan's* did not create and should not be interpreted as creating a new civil cause of action for embracery.

The focus of *Doan's* is whether the influencer could be found in contempt of court or indicted for an embracery misdemeanor or both. We are of the opinion the *Doan's* court did not intend to create a new embracery tort in a dicta clause of one sentence of the case.

Next, OMI cites to *Employers Insurance v. Hall,* 49 N.C. App. 179. In *Hall,* the plaintiff was an insurance company that spent money defending an insured/hospital in a prior suit. In the prior suit, an attorney involved in the case attempted to improperly influence a juror. After 6½ days of trial, the judge declared a mistrial. The judge found that the attorney could be held liable under the common law for the insurance company's monetary damages as a result of the attorney's juror contacts and the subsequent mistrial. In so finding, the court stated:

"Defendant contends he is not responsible in civil damages for the act of embracery. We reject this argument and hold that a person who commits an act of embracery is liable in civil damages to one who is damaged thereby. 29A C.J.S. Embracery § 10 (1965). Surely an act so abhorrent to the fair administration of justice requires that the perpetrator pay the full measure for his acts, both to society in the form of criminal punishment and in civil damages to individuals who suffer from his actions. The crime strikes to the foundation of law and shatters the very bedrock of justice." 49 N.C. App. at 181.

Howell tries to discredit *Hall.* Howell points out that *Hall* relied on the 1965 C.J.S. Embracery section. The 1965 version of C.J.S. relied on *Doan's* as authority. However, the 1992 version of C.J.S. omits *Doan's* as authority for an embracery tort. Howell contends that 1992 C.J.S. omitted *Doan's* because the C.J.S. authors realized

that the 1965 C.J.S. misinterpreted *Doan's* as recognizing an embracery tort. Thus, according to the defendant, the *Hall* court improperly relied on the 1965 version of C.J.S. in holding that an embracery tort exists; therefore, *Hall* is not persuasive authority.

Further, Howell suggests that the fact North Carolina recognizes a common-law felony for embracery may explain why a North Carolina court, in *Hall*, also recognized a common-law tort for embracery. As Howell points out, neither Kansas nor the federal courts recognize a common-law felony for embracery. Instead, both Kansas and the United States have promulgated criminal statutes which punish embracery. Thus, the defendant contends that since Kansas does not recognize a common-law felony for embracery, it would not recognize a common-law tort for· embracery either.

*Hall,* as we read it, did not base its recognition of the common-law tort of embracery on the fact that North Carolina recognizes a common-law felony of embracery. Further, it is not significant that *Hall* relied on the 1965 version of C.J.S. It is true that the 1992 version of C.J.S. omits *Doan's.* However, the 1965 C.J.S. did not cite to *Doan's* as authority for the existence of a common-law embracery tort. Rather, the 1965 C.J.S. cited *Doan's* as an example of a case interpreting a criminal embracery statute. Thus, the omission of *Doan's* in the 1992 C.J.S. does not affect C.J.S.'s conclusion that a common-law action for embracery exists. The 1992 version of C.J.S. still recognizes a common-law embracery tort. Thus, even if the 1965 C.J.S. misinterpreted *Doan's* (which it does not appear that it did), the validity of 1965 C.J.S. conclusion—that an embracery tort exists—is not in question.

OMI also cites to *LaBarre v. Payne,* 174 Ga. App. 32, as recognizing an embracery tort. Payne was the plaintiff in a prior action who sued a member of a bank's board of directors. As an employee of the bank, LaBarre became interested in the case and began attending the trial. LaBarre was a friend of one of the jurors in the prior action and contacted her frequently during the trial. After one day of jury deliberations, LaBarre contacted her juror friend, and the juror asked LaBarre about a legal issue in the case. LaBarre told the juror her opinion and LaBarre also contacted her (La-

Barre's) former attorney for advice on the issue. The attorney recognized the issue, discovered that LaBarre had been communicating with a juror, and brought this to the attention of the trial court. The trial court declared a mistrial over Payne's objections. Payne settled the case with the board of director member and brought this action against LaBarre for, *inter alia*, embracery. The appellate court reversed the trial court's grant of summary judgment to LaBarre and recognized the tort of embracery, stating: "We reject LaBarre's argument that there is no civil cause of action for embracery and hold that a person who commits embracery is liable in civil damages to one who thereby injured. [Citations omitted.]" 174 Ga. App. at 34. The fact that LaBarre's actions also violated Georgia's criminal embracery statute did not affect the court's recognition of an embracery tort.

Howell points out that *LaBarre* cited *Hall* and the 1965 version of C.J.S., without analyzing *Doan's* or the Georgia criminal embracery statute, in determining that an embracery tort exists. According to Howell, the *LaBarre* court assumed an civil action for embracery existed simply because *LaBarre* violated the criminal embracery statute.

It is true that the 1992 C.J.S. no longer relies on the same cases as the 1965 C.J.S., but the 1992 C.J.S. still recognizes an embracery tort, which is the reason why *LaBarre* cited to 1965 C.J.S. in the first place. *LaBarre* did not directly rely on *Doan's*; thus, the omission of this case in the 1992 C.J.S. is irrelevant. The *LaBarre* court found an independent action for embracery tort existed in common law. Thus, this case supports OMI's position.

Finally, OMI cites *Trudell v. Heilman*, 158 Cal. App. 3d 251. In *Trudell*, the plaintiff had previously sued the defendant in a personal injury action. In this prior case, the defendant secretly met with a juror and told the juror that he (the defendant) was a poor man and could not afford to pay a large judgment. The juror told the jury that the defendant was poor and that the jury should award a small judgment to the plaintiff. The jury was influenced and awarded a much smaller damage award to the plaintiff than the amount of damages actually suffered by the plaintiff. The plaintiff became aware of the defendant's improper juror influence before

the damage judgment became final, but the plaintiff, after being informed of the facts, elected not to request a mistrial or a new trial. Instead, the plaintiff sued the defendant and the juror in this later action for civil damages under the tort of embracery. 158 Cal. App. 3d at 253. The trial court refused to recognize a tort of embracery under the circumstances because the plaintiff did not file a motion for a new trial in the original action where the improper juror contact occurred. 158 Cal. App. 3d at 253. The appeals court affirmed, stating:

"[I]t seems clear that any such [embracery] action would be disfavored for reasons of public policy and it should not be allowed *unless a litigant has no other means of redress*. Here, the facts now relied on obviously were known to the plaintiff before the judgment in the prior case had become final and within time for him to have acted on the first trial judge's suggestion to move for a new trial. Having failed to utilize that mode of redress, which, if his present allegations are true, probably would have resulted in an order granting a new trial at least on the issue of damages, the present action for damages cannot be maintained." 158 Cal. App. 3d at 254. (Emphasis added.)

OMI contends that *Trudell* supports its position because OMI is a litigant with no other means of redress; thus, an embracery action should be recognized under this situation. OMI reasons that it does not have any other means of redress, except for an embracery action, because it has already utilized all of the other means of redress in order to receive compensation for its damages without success. For instance, OMI filed attorney fee petitions which were denied by the federal courts. Thus, OMI contends that it has not been compensated for the damages which the defendant caused and that it has no other means of redress except for an embracery cause of action. As such, OMI contends that an embracery tort should be recognized in this situation.

Howell contends that OMI has misinterpreted the *Trudell* case. According to Howell, *Trudell* does not imply that an embracery tort exists just because a party has unsuccessfully tried to receive compensation through every other means of redress and has no other means of redress available except for an embracery tort. Instead, Howell reasons that *Trudell* would only recognize an embracery tort if a party discovered the juror influence after it was

too late for the party to achieve relief through a motion for mistrial or new trial, thereby leaving the plaintiff without other means of redress. Using this interpretation of *Trudell*, Howell contends that OMI did have other means of redress available throughout the first trial. For instance, OMI sought and received a mistrial and a new trial upon learning of the juror influence. OMI also sought a fee petition in the federal court. Thus, according to Howell, OMI does not qualify as party eligible to use the embracery tort under *Trudell* because OMI had other means of redress available to it, some of which were successful and some of which were not.

We agree with the defendant's interpretation of *Trudell*. If *Trudell* is interpreted otherwise, then the plaintiff is rewarded for the fact that its other requests for relief were denied, possibly because they were meritless, by receiving the opportunity to bring a civil embracery tort because all of its other means of redress have been unsuccessful. However, the more injured plaintiffs, those who receive relief at trial because their claims have merit, are not allowed to bring a tort claim for embracery because they have other successful means of redress available. This does not make sense. Instead, *Trudell* found that if a party became aware of juror influence at trial, then it should fix the problem by requesting a mistrial and a new trial. If the plaintiff does this or had the opportunity to do this, as is the case in *Trudell*, then an embracery tort is not allowed. However, if the party does not become aware of the juror influence until after it is too late to repair the prejudice at trial by requesting a mistrial, then no other means of redress is available, and an embracery tort may be allowed. Here, OMI discovered the juror influence while the underlying trial was still going on, and OMI had an opportunity for redress by receiving a mistrial, a new trial, and requesting a fee petition. Thus, *Trudell* does not support OMI's position by allowing an embracery tort under these circumstances. Therefore, two of OMI's cited cases support the recognition of an embracery tort (*Hall, LaBarre*), one does not (*Trudell*), and one case does not really address an embracery tort at all (*Doan's*).

Kansas courts have never ruled upon whether embracery is a tort which should be recognized in Kansas. OMI contends that public policy requires this court to recognize an embracery tort. In

support of its position, OMI cites to some basic principles of tort law, such as: "A tort is a violation of a duty imposed by law." *Mills v. City of Overland Park*, 251 Kan. 434, 445, Syl. ¶¶ 2, 3, 4, 5, 6, 837 P.2d 370 (1992) (finding that a tort cause of action did not exist for the failure of a law enforcement officer to take an intoxicated person into custody because the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large, not to a specific individual); see Prosser and Keeton, Law of Torts §§ 1, 4, pp. 6, 20 (5th ed. 1984) (when imposing tort liability, the court should take into account the policy considerations of the victim's right to compensation and the reasonableness of the defendant's conduct).

Further, OMI cites to several cases in which Kansas courts have found that it was proper to adopt a new cause of action based on public policy, such as wrongful birth, wrongful discharge, outrage, loss of chance of survival, false light, intrusion upon seclusion, and invasion of privacy. *Arche v. United States of America*, 247 Kan. 276, 798 P.2d 477 (1990); *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981); *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104 (1974); *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984); *Rinsley v. Frydman*, 221 Kan. 297, 559 P.2d 334 (1977); *Froelich v. Adair*, 213 Kan. 357, 516 P.2d 993 (1973); *Kunz v. Allen*, 102 Kan. 883, 172 Pac. 532 (1918); see also *Ling v. Jan's Liquors*, 237 Kan. 629, 640, 703 P.2d 731, 739 (1985) (stating "Indeed, we have not hesitated to adopt a new cause of action by judicial decision where we have determined that course was compelled by changing circumstances," but refusing to impose civil liability upon vendors of alcoholic beverages for torts of inebriated patrons because this is a matter of public policy which the legislature is best equipped to handle); and *Hoffman v. Dautel*, 189 Kan. 165, 168, 169, 368 P.2d 57 (1962) (stating "[n]ovelty is not sufficient to prevent recovery and the absence of precedent does not prove that a cause of action cannot be maintained. [Citation omitted.] One of the basic characteristics of the common law is that it is not static, but is endowed with vitality and capacity to grow" but holding that children do not

have an action for loss of consortium based on parent's injury due to "possibility of multiplicity of actions based upon a single tort.").

On the other hand, Howell also cites to some general principles of tort law, such as Prosser's comment, that "[t]here are many interferences with the plaintiff's interests, such as negligently causing him mere mental suffering without physical consequences or depriving him of the benefit of a contract, for which the law will give no remedy, although the defendant has clearly been at fault." Prosser, Law of Torts § 1, p. 4 (4th ed. 1971). See *Allin v. Schuchmann*, 886 F. Supp. 793, 799-800 (D. Kan. 1995) (no civil action under Kansas law for intentional infliction of emotional distress caused by alleged perjury.)

In finding that Kansas would not recognize the tort of embracery, the federal district court relied on *Koplin v. Rosel Well Perforators, Inc.*, 241 Kan. 206, Syl. ¶ 2, 734 P.2d 1177 (1987) (refusing to recognize a common-law tort action for spoliation of evidence), and *Hokanson v. Lichtor*, 5 Kan. App. 802, 626 P.2d 214 (1981) (refusing to recognize a civil action for perjury).

In *Koplin*, a federal district court certified a question to this court, asking "whether Kansas would recognize a common-law tort action for intentional interference with a prospective civil action by spoliation of evidence." 241 Kan. at 207. In the *Koplin* case, the plaintiff was injured at work by a clamp which malfunctioned. The plaintiff planned to sue the manufacturer and the distributor of the clamp. However, the plaintiff was not able to bring the lawsuit against the manufacturer and distributor because the clamp disappeared. Instead, the plaintiff sued his employer for intentional interference with a prospective civil action by spoliation of evidence. The plaintiff alleged that his employer intentionally destroyed the clamp in order to deny him access to evidence so that he would not be able to sue the clamp manufacturer and distributor. 241 Kan. at 208.

In determining whether Kansas recognizes this cause of action, this court pointed to the fundamental rule that before a plaintiff can recover under a tort claim, the defendant must have violated a duty which it owed to the plaintiff. 241 Kan. at 212. Based on this rule, the court found that the employer could not be held liable

unless it owed a duty to the plaintiff to preserve the clamp. 241 Kan. at 213. This court also pointed to the general rule that one does not have a duty to preserve potential evidence for another party unless some special relationship exists between the two parties arising though an agreement, contract, statute, or other special circumstances. 241 Kan. at 208. In this case, the court found no special circumstances which would have created a duty the defendant/employer owed to the plaintiff/employee. 241 Kan. at 213. This court found that "[t]o adopt such a tort and place a duty upon an employer to preserve all possible physical evidence that might somehow be utilized in a third-party action by an injured employee would place an intolerable burden upon every employer." 241 Kan. at 212.

Finally, in refusing to recognize this tort, this court cited with approval a dissent written by Chief Judge Schwartz in *Bondu v. Gurvich*, 473 So. 2d 1307 (Fla. Dist. App. 1984), *rev. denied* 484 So. 2d 7 (Fla. 1986). *Bondu* recognized a negligent spoliation of evidence action, but Judge Schwartz stated:

" 'In my view, such a rule runs counter to the basic principle that there is *no cognizable independent action* for perjury, or *for any improper conduct even by a witness*, much less by a party, in an *existing lawsuit*. [Citation omitted.] *Were the rule otherwise, every case would be subject to constant retrials in the guise of independent actions.*' " 241 Kan. at 214 (quoting 473 So. 2d at 1313-14). (Emphasis added.)

Thus, this court stated:

"We conclude that absent some independent tort, contract, agreement, voluntary assumption of duty, or special relationship of the parties, the new tort of 'intentional interference with a prospective civil action by spoliation of evidence' should not be recognized in Kansas." 241 Kan. at 215.

Based on this case, Howell contends that the key to a new tort is whether the defendant owed a duty to the plaintiff. Here, Howell argues that he did not owe a duty to OMI. Instead, Howell contends that he owed a duty to the court to refrain from improper juror contacts; he did not owe this duty to OMI. Thus, according to Howell, a tort of embracery cannot exist under these circumstances.

The second case which the federal district court relied on in ruling that Kansas would not recognize an embracery tort is *Hokanson v. Lichtor*, 5 Kan. App. 2d 802. In *Hokanson*, the plaintiff was involved in a car-motorcycle accident. The plaintiff, in a prior suit, sued Margaret Faulkner for injuries arising out of this accident. Faulkner was insured by State Farm Mutual Insurance Company against liability arising out of the use of her automobile. In defending Faulkner, State Farm hired an attorney, Lee Turner, to represent Faulkner in the personal injury case. State Farm and Turner hired a doctor, Joseph Lichtor, to evaluate the plaintiff's injuries and testify at trial as a defense expert. Lichtor testified at the trial, and the jury awarded the plaintiff $50. The plaintiff thought that Lichtor had lied regarding her medical injuries at the trial. Thus, the plaintiff filed this action against State Farm, Turner, and Lichtor, alleging that the three had conspired to present perjured testimony through Lichtor. The trial court dismissed the plaintiff's action for failure to state a claim and the plaintiff appealed. The Court of Appeals addressed the issue of whether a civil action exists for perjury or conspiracy to commit perjury.

The Court of Appeals pointed to the rule that a plaintiff who has lost a case due to perjured testimony may not sue the perjurer for damages. This rule is based on the fact that the remedy for perjury should be criminal sanctions or an action to set aside the judgment instead of civil damages. Based on this rule, the *Hokanson* court refused to recognize a cause of action for perjury or conspiracy to commit perjury.

In affirming the trial court's dismissal of the plaintiff's petition for failure to state a claim, the Court of Appeals stated:

"We adopt the reasoning of the majority of jurisdictions—that *litigants must have access to expert opinion evidence and witnesses must be available to testify without fear of having to incur fees and expenses to defend their testimony in subsequent actions*, which would do nothing more than 'rehash' the same issue determined in an original case; *i.e.*, what testimony is the jury to believe? *Litigation must end at some point. To permit actions such as plaintiff contemplates in this case might ultimately result in depriving the judicial system of expert witnesses who are invaluable to all segments of the bar.* Most improvements in science, the law and society have resulted because some person has thought and expressed views different from the prevailing view. The advocacy system is designed to test those

views, and the trier of facts decides whether to accept or reject the opinion evidence of an expert or the testimony of a nonexpert. Here, through discovery, the plaintiff had an opportunity to learn of and expose any perjury that in his opinion defendants had committed. The courts must zealously protect the rights of all litigants to present their evidence within the framework of the law. *If perjury is committed in a trial, a litigant is not left helpless; procedure is available to obtain a new trial. Criminal penalties are available against the perjurers and those who engage in a conspiracy to commit perjury. Disciplinary rules are available to punish lawyers who engage in such reprehensible conduct.*" 5 Kan. App. 2d at 810-11. (Emphasis added.)

In *Koplin* and *Hokanson*, the courts rejected these civil actions because of the policy problems they would create. Here, the federal district court found that many of the policy problems present in those cases are also present in the recognition of an embracery tort. For instance, recognition of an embracery tort would impose a new duty on all witnesses, which they owe to adverse litigants, not to communicate with jurors. Further, an embracery tort would create duplicative litigation because other penalties exist to punish jury tampering. Finally, an embracery tort might constitute a collateral attack upon the first judgment and would create difficulty in determining damages. As such, the district court refused to recognize an embracery tort.

### Imposition of a New Duty

Here, OMI contends that an embracery tort does not impose any additional duties on a defendant/witness because a witness has a preexisting duty to avoid contact with jurors imposed on the witness by the criminal embracery statute, by the trial judge's admonition against juror contact, and by the ethical rules for attorneys. OMI reasons that when a reasonable duty already exists on a defendant, then Kansas law has no reason not to impose tort liability; thus, it should do so in this case. See *Foster v. Lawrence Memorial Hosp.*, 809 F. Supp. 831, 838 (D. Kan. 1992).

In *Foster*, the plaintiffs' son was injured and treated at Lawrence Memorial Hospital by Dr. Geist. Dr. Geist made some personal notes concerning the treatment he rendered. When their son died, the plaintiffs brought a medical malpractice action in federal court against Dr. Geist and Lawrence Memorial Hospital. After finding

out that he might be sued, Dr. Geist prepared a chronology of events using his personal notes. He then threw away his personal notes. After becoming aware of this conduct, the plaintiffs amended their complaint, alleging that Dr. Geist negligently or intentionally destroyed his notes in violation of his common-law or statutory duty as set out in K.A.R. 100-24-1. Dr. Geist filed a motion for partial summary judgment on this claim, arguing that Kansas does not recognize a cause of action for intentional or negligent spoliation of evidence.

Geist contended that he did not owe a duty to the plaintiffs to keep the notes intact because he did not agree to keep the notes, nor does K.A.R. 100-24-1 require a physician to keep personal notes. On the other hand, the plaintiffs contended that Geist owed them a duty based on the special doctor/patient relationship which existed between Geist and the victim of malpractice. Further, the plaintiffs contended that K.S.A. 60-427 (physician-patient privilege statute), the physician's code of ethics, and K.A.R. 100-24-1 all impose a duty on Geist to keep the notes.

The *Foster* court pointed to the *Koplin* case in which this court stated: " 'We conclude that absent some independent tort, contract, agreement, voluntary assumption of duty, or special relationship of the parties, the new tort of 'intentional interference with a prospective civil action by spoliation of evidence' should not be recognized in Kansas.' " 809 F. Supp at 837.

Based on this language, the *Foster* court concluded that the Kansas Supreme Court would recognize the tort of spoliation if the defendant already owes an independent duty to the plaintiffs to preserve the evidence and this duty is not a new common-law duty imposed on the defendant as a part of the tort. The court then found that K.A.R. 100-24-1 imposed an independent duty on Dr. Geist to retain the records of patients he treats. As such, it was a factual question for the jury to determine whether Dr. Geist breached this duty and committed the tort of spoliation of evidence. Thus, the court denied Dr. Geist's request for partial summary judgment on this issue. 809 F. Supp. at 838. Later, the district court held that the plaintiffs could not assert a claim for spoliation of evidence because they did not claim any damages which were

distinct from the underlying medical malpractice claim. See *Foster v. Lawrence Memorial Hosp.*, 818 F. Supp. 319, 322 (D. Kan. 1993).

Thus, OMI argues that a new duty which is intolerably burdensome is not created by recognizing the embracery tort. According to OMI, the policy reason in *Koplin* which prevented this court from recognizing a spoliation tort—that the defendant did not owe a preexisting duty to the plaintiff to protect the evidence and that it would be too burdensome to impose such a new duty on the defendant—is not implicated here. Here, OMI asserts that the defendant already owed a preexisting duty to refrain from juror contact imposed by the criminal embracery statute, the trial judge's admonition against juror contact, and the attorney ethical rules.

Howell concedes that he does have a duty to refrain from improper jury contacts which is imposed on him by the criminal embracery statute, the trial judge's admonition against juror contact, and the attorney ethical rules. However, Howell contends that he only owes this duty to refrain from improper juror contact to the court, not to an adverse litigant. In support of this argument, Howell addresses each of the factors which impose a duty on him to refrain from juror contact—the criminal embracery statute, the judge's admonitions, and the attorney ethical rules—and evaluates whether these factors impose a duty on him which he owes to the court or to an adverse litigant such as OMI.

First, Howell contends that the Kansas criminal embracery statute (K.S.A. 21-3815) imposes a duty on him which he only owes to the court, not to the litigants, because the purpose of such a statute is to protect the integrity of the court. See *State v. Torline*, 215 Kan. 539, 527 P.2d 994 (1974) ("[O]ur [embracery] statute appears to have been designed to achieve twin goals of protecting a judicial officer in specific proceedings and to prevent a miscarriage of justice in cases which are or may be brought before such judicial officer.") See also *State v. Reed*, 213 Kan. 557, 560, 516 P.2d 913 (1973) (holding that K.S.A. 1972 Supp. 21-3806, "which makes it an offense to corruptly influence a witness, is primarily designed to prevent the corrupt interference with the administration of justice.").

In further support of Howell's position that the embracery stat-
ute imposes a duty on him which he only owes to the court and
not to adverse litigants, Howell points out that there are a number
of other duties which attorneys and witnesses only owe to the
courts or to the public but do not owe to adverse litigants. For
instance, Howell cites to *Lewis v. Swenson*, 126 Ariz. 561, 617 P.2d
69 (Ct. App. 1980). In *Lewis*, a woman had previously filed a med-
ical malpractice action against a doctor. The doctor hired Seidel as
his attorney and Seidel hired Swenson as an expert witness for the
defense. In response to a direct examination question asked by
Seidel, Swenson mentioned the high cost of medical malpractice
insurance. The trial court granted a mistrial. The woman died, and
the person appointed as the woman's personal representative
brought this action. The plaintiff sued the expert witness (Swenson)
for intentionally or recklessly disclosing prejudicial information to
the jury and sued the attorney (Seidel) for negligently failing to
instruct the witness to refrain from disclosing prejudicial infor-
mation to the jury. The plaintiff sought to recover as damages the
money spent on the medical malpractice trial and the money orig-
inally claimed as damages in the malpractice action.

The plaintiff's complaint alleged that the attorney, Seidel, owed
a duty to the opposing party in the original lawsuit and to the court
to prevent his expert witness from testifying about prejudicial and
inadmissible information. Further, the complaint alleged that the
expert, Swenson, owed a duty to the opposing party to refrain from
mentioning information which the expert knew was prejudicial and
inadmissible. The trial court granted the defendants' motions to
dismiss for failure to state a claim. The Arizona Court of Appeals
found that even if an attorney and a witness had a duty to refrain
from presenting insurance information to the jury, this duty was
owed only to the court, not to the adverse party. The court held
that a breach of the attorney's or the witness' duty owed to the
court would not give rise to tort action by the adverse party. Thus,
using this case as an analogy, Howell contends that the criminal
embracery statute imposed a duty on him to refrain from juror
contact which he only owed to the court, not to the adverse litigant
OMI. We agree.

Further, Howell contends that the federal embracery statute could not have imposed a duty on him to refrain from contacting jurors which he owed to OMI because the federal courts do not recognize an implied civil action for embracery based on a violation of that statute. See *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123 (10th Cir. 1953), *cert. denied* 345 U.S. 941 (1953) (finding that federal embracery statute was passed in the interest of the public). This argument is irrelevant because the federal district court ruled that Kansas substantive law applies to Howell. If the federal court should later determine that Kansas law does not apply, the federal court can determine what the federal law is regarding embracery.

Next, Howell contends that the district court's admonition against juror contact only imposed a duty on him which he owed to the court, not to the adverse party. In support of this argument, the defendant cites *Hendrix v. Consolidated Van Lines, Inc.*, 176 Kan. 101, 269 P.2d 435 (1954). In *Hendrix*, the plaintiff sued Consolidated Van Lines for personal injury based on a car accident. The appellee in this case, American Automobile Insurance Company and Associated Indemnity Company (insurance companies) were not involved in the personal injury action in any way. However, in the 3 months before the personal injury trial, the insurance companies published, in two widely distributed magazines, a series of full-page ads which discouraged future jurors from awarding large damage awards so that insurance premiums would not rise.

The plaintiff of the personal injury action filed a motion for the insurance companies to appear and show cause why they should not be held in indirect contempt of court, alleging that the companies' actions constituted jury tampering. The trial court found the insurance companies were not guilty of indirect contempt of court. The plaintiff appealed. The insurance companies filed a motion to dismiss, alleging that the "contempt charged is criminal in nature, not civil, and that no appeal lies from a judgment of not guilty of criminal contempt." 176 Kan. at 106.

While *Hendrix* is not directly on point, it discusses a judge's power to punish a nonparty for jury tampering through contempt proceedings. This court found that such punishment is criminal in nature because it is imposed to protect the government, the people,

the administration of justice, and the dignity of the court; the punishment is not given to protect the adverse litigant. Thus, it makes sense that if a judge is admonishing (instead of punishing) a nonparty from participating in jury tampering, the admonition would also be entered to protect the government, the people, the administration of justice, and the dignity of the court, and not meant to protect the adverse litigant. Since this is the case, then the judge's admonition against juror tampering would only place a duty on the witness to refrain from jury tampering owing to the court and not to the adverse party.

Finally, Howell concedes that as a witness/attorney, the attorney ethics rules imposed a duty on him to refrain from juror contact. However, Howell again contends that he only owed this duty to the court and not to the adverse party. In support of this argument, the defendant cites *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980).

The defendants/attorneys in *Nelson* had previously filed a malpractice action against the plaintiff/doctor on behalf of a third party. Upon conclusion of the malpractice action, the doctor filed this action against the attorneys who filed the malpractice action, alleging negligence and malicious prosecution of a civil action. The district court granted the attorneys' motions to dismiss the action for failure to state a claim. The district court held that the doctor did not have a claim against the attorneys based on negligence because the attorneys had not been employed by the doctor. This court addressed whether the district court properly dismissed the doctor's claim based on negligence.

In his petition, the doctor alleged that the attorneys were negligent because they failed to investigate the claim against him and because they continued to prosecute the claim knowing that it was unjust and without merit. In support of his negligence claim, the doctor pointed to DR 7-102(A) of the Code of Professional Conduct (now MRPC 3.1 [1995 Kan. Ct. R. Annot. 308]), which prohibits an attorney from asserting claims which the attorney knows are groundless.

This court pointed to the general rule that an attorney can only be held liable for negligence to a client who the attorney has a

contract with or to a third-party beneficiary of the contract. Typically, an attorney is not liable for negligence to a nonclient or non-beneficiary because the "attorney's paramount and exclusive duty" is to his or her client. 227 Kan. at 287. This court upheld the rationale that a lawyer's duty must be to his or her client alone and "there is no room for any duty running to the client's adversary." 227 Kan. at 287. In affirming the district court's dismissal of the negligence claim, this court held that "a violation of the Code of Professional Responsibility does not alone create a cause of action against an attorney in favor of a third party." 227 Kan. at 289. Based on this case, Howell contends that if the Code of Professional Responsibility (now MRPC 3.5[b] [1995 Kan. Ct. R. Annot. 317]), which prohibits attorney contact with jurors, imposed a duty on him at all while he was acting as a witness, it was a duty he owed to the court and not to the adverse litigant, OMI.

However, OMI contends that *Nelson* is distinguishable. OMI points out that the defendant's duty as an expert witness, who was not representing a client, cannot be compared to the exclusive duty owed by an attorney to a client. OMI contends that the Code of Professional Responsibility imposed on the witness/attorney, Howell, a duty not to contact jurors which Howell owed to both the party who hired him and the adverse litigant. Thus, according to OMI, civil liability against Howell can be based on this duty. We do not agree.

The attorney ethics rules do not impose a duty on a witness, owing to an adverse litigant, to refrain from juror contact. This is because most witnesses are not also lawyers and the attorney ethics rules would not apply to them at all; thus, the rules could not impose a duty on them. It is true that the ethics rules applied to Howell because he was not only an expert witness but was also an attorney. However, Howell was acting as a witness and all witnesses, whether or not they are attorneys, should owe the same duties to the adverse party. Since the ethics rules do not place a duty on the nonlawyer witness owing to the adverse litigant, then the rules should not place a duty on the attorney/witness owing to the adverse litigant. Any duty which the ethics rules impose on an attorney/witness is owed to the court.

More importantly, an attorney's violation of the ethics rules cannot create a cause of action available to adverse litigants or even to clients. This is because the ethics rules do not impose a legal duty on the attorney owing to either a client or a third party. Occasionally, attorney conduct which violates an ethics rule may also violate an independent legal duty, and a cause of action may ensue. It is the violation of the independent legal duty, not the ethics rule, that gives rise to a cause of action. This is made clear by Rule 226, Model Rules of Professional Conduct, Scope of Rules, which states:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are involved by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." Rule 226 (1995 Kan. Ct. R. Annot. 249).

## Duplicative Litigation

The United States District Court also found that, like in *Hokanson* and *Koplin*, the recognition of an embracery tort should not be recognized because it would result in duplicative litigation. For instance, the trial court granted a new trial at OMI's request. Further, OMI requested a fee petition to recover the money wasted on the mistrial, but the federal court denied its request. The United States District Court reasoned an embracery tort would relitigate many of the issues already considered by the trial judge in granting OMI's motion for a new trial and in denying OMI's fee petition. Thus, the United States District Court ruled that recognition of an embracery tort was contrary to public policy favoring finality in judgments. The United States District Court found that the issues in question would be best handled by the trial judge of the underlying litigation where the jury tampering allegedly occurred, rather than by a new judge assigned to hear the embracery tort action who was not familiar with the underlying litigation. However, OMI

contends that these policy concerns are not implicated here because an embracery tort is not a collateral attack, is not subject to abuse, and is not a duplicative relitigation of a prior issue.

OMI concedes that *Koplin* and *Hokanson* properly held that perjury and spoliation torts should not be recognized because they could lead to endless litigation without finality. According to OMI, actions for perjury and spoliation of evidence are an attack on a prior judgment because the actions question whether the prior judgment would have been entered had a witness not committed perjury or had evidence not been destroyed. OMI points out, however, that this can never occur in an embracery tort because one of the elements of an embracery tort is the requirement that an order granting a mistrial or new trial be issued. This element insures that the final judgment of the underlying litigation will not be collaterally attacked. Instead, OMI contends that an embracery tort only addresses the witness' conduct which caused the mistrial and only seeks to recover the expenses spent on the mistrial.

Further, OMI contends that this element of the embracery tort—an order granting a mistrial or new trial—will prevent abuse of the tort. In order for a judge to grant a mistrial or new trial, the judge must find that a witness' improper communication with a juror interfered with a party's fair trial. Thus, according to OMI, improper pleading of an embracery tort will be rare because the plaintiff must have already had the trial judge find the witness' juror contact was improper and declare a mistrial. OMI also points out that very few embracery torts are reported across the nation, thereby indicating that the tort occurs infrequently. Thus, recognition of the tort will not impose any serious burden on the dockets of the Kansas courts.

Finally, OMI contends that an embracery tort is not duplicative of the trial court's decisions to grant a mistrial and to deny OMI's fee petition. OMI acknowledges that an embracery tort may involve consideration of some of the same facts that were reviewed in these previous trial court rulings. However, OMI points out that the issues, the elements, and the burdens of proof are not the same in a declaration of a mistrial or the determination of a fee petition as they are in an embracery tort.

For instance, according to OMI, the issue raised in its fee petition under 28 U.S.C. § 1927 (1994) was whether the court found that the witness had engaged in unreasonable and vexatious conduct which caused a mistrial. In the fee petition proceeding, the trial court was not concerned with whether OMI should be compensated for the damages caused by Howell's juror contacts. Instead, the court was concerned only with the integrity of the trial process. Further, the parties did not have an opportunity for discovery or to present witnesses before the trial court decided to grant a mistrial and deny OMI's fee petition. OMI contends that in an embracery tort, it would engage in discovery and present witnesses to prove that Howell should compensate OMI for the damages caused by his juror contacts. Thus, OMI contends that the embracery tort would not be duplicative of or relitigate the trial judge's decision to grant a mistrial and deny its fee petition. See *U.S. Aluminum Corp./Texas v. Alumax, Inc.*, 831 F.2d 878 (9th Cir. 1987), *cert. denied* 488 U.S. 822 (1988) (finding that denial of fee petition in patent infringement action did not collaterally estop an action for malicious prosecution because the burden of proof for the fee petition was clear and convincing evidence, while burden of proof for malicious prosecution was preponderance of the evidence.)

On the other hand, Howell contends that an embracery action would result in duplicative litigation. Howell points out that OMI has previously attempted to recover the same damages it seeks in the embracery action through fee petitions in federal court. Howell argues that OMI's embracery action is simply a collateral attack on the federal court's denial of OMI's fee petition. Howell concedes that the embracery tort and the fee petition motion require different burdens of proof. However, according to Howell, this does not, in and of itself, prevent the embracery tort from being duplicative of the prior fee petition or mistrial proceedings. Howell argues that the issues at stake in the embracery tort have already been decided in the mistrial and fee petition rulings by the federal court, which was familiar with the underlying litigation. Howell contends that these proceedings provided an adequate remedy to protect OMI's interest. According to Howell, there is no need for yet another layer

of relief by recognizing a civil damage action for embracery. In fact, Howell contends that if one of OMI's prior efforts in federal court to recover its mistrial expenses had been successful, then the embracery tort suit never would have been filed.

OMI apparently sought to recover its wasted mistrial expenses from Howell under 28 U.S.C. § 1927, which states:

"Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

While the denial of the fee petition would not act as res judicata upon the embracery tort, there is no reason to give a totally different trial court, without knowledge of the underlying litigation, another chance to determine who should bear the wasted mistrial costs.

## Other Remedies

The district court also found that, as in *Hokanson* and *Koplin*, remedies other than a civil suit exist to deal with jury tampering, such as criminal penalties, mistrials, new trials, sanctions under 28 U.S.C. § 1927, or the inherent power of the court to find a participant in contempt of court. See *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S. Ct. 497, 93 L. Ed. 599 (1949) (finding that when a party violates a court decree [or court admonitition] , whether or not it be intentional, a court can order compliance through civil contempt, including payment of money, stating that, "the measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief").

Howell agrees, contending that the creation of a civil action for embracery is inconsistent with both the federal and state legislative scheme for dealing with embracery. For instance, Howell points out that both the United States and Kansas have enacted criminal embracery statutes which punish those witnesses who engage in jury tampering. 18 U.S.C. § 1503 (1994); K.S.A. 21-3815. Further, a court may exercise its contempt powers against a witness who violates a court admonition by improperly influencing a juror.

K.S.A. 20-1204a ("If the court determines that a person is guilty of contempt, such person shall be punished as the court shall direct."). See *Electronic Realty Assocs., Inc. v. Gomez*, 18 Kan. App. 2d 122, 128, 848 P.2d 458 (1993) (" ' "Where a party has acted in willful and deliberate disregard of reasonable and necessary orders of the court, the application of a stringent sanction is fully justified." ' "). The court may also grant a mistrial or new trial to protect the rights of a party who was prejudiced by the witness' improper juror contacts. Finally, the court may impose monetary or evidentiary sanctions upon a party whose witness engages in jury tampering.

However, OMI contends that the existence of a criminal embracery statute or the availability of other court sanctions does not preclude the recognition of an embracery tort. OMI points to intentional tort actions such as assault, battery, and false imprisonment which exist even though a criminal statute also punishes the same conduct. OMI reasons that improper juror contacts by a witness can affect individual and state interests differently. Thus, these interests should be protected by two different suits for the same conduct—a civil tort action and a criminal prosecution. The plaintiff then points to *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, 392-93, 736 P.2d 930 (1987).

In *Fasse*, the defendant contracted to construct a building for Washburn University. The contract provided that the defendant would pay its laborers equivalent to the wages set for federally assisted construction projects pursuant to K.S.A. 44-201 (Ensley 1986). The defendant did not do so. The laborers, as third-party beneficiaries, sued the defendant and sought to recover unpaid wages, alleging that the defendant violated the contract provision requiring compliance with 44-201. The statute provided fines and imprisonment for violations of 44-201, but did not provide a civil remedy for employees damaged by an employer's failure to comply with the statute. As such, the defendant alleged that 44-201 did not provide the employees with a private cause of action for unpaid wages.

This court stated:

"Generally, the common-law procedure is regarded as the proper remedy where a right is created or a duty is required by statute and no adequate statutory remedy is provided for its enforcement or breach or where the special remedy created by statute is void. 1 Am. Jur. 2d, Actions § 75.

"Courts do not require explicit statutory authorization for familiar remedies to enforce statutory obligations. When the legislature has left the matter at large for judicial determination, the court's function is to decide what remedies are appropriate in light of the statutory language and purpose and the traditional modes by which courts compel performance of legal obligations. If civil liability is appropriate to effectuate the purposes of a statute, courts are not denied this traditional remedy because it is not specifically authorized. [Citations omitted.]" 241 Kan. at 392-93.

Thus, this court held that the employees were able to request any civil remedy which they had available, including a civil action asserting a claim for unpaid wages. 241 Kan. at 393.

In comparison, OMI contends the federal and state criminal embracery statutes impose a duty on a witness not to influence jurors—a duty which OMI claims the witness owes to adverse litigants. OMI concedes that the criminal embracery statutes punish witnesses who improperly contact jurors and deter other witnesses from participating in this same behavior. Yet, OMI points out that the criminal embracery statutes do not compensate those injured by a witness' wrongful conduct. Thus, OMI argues that the criminal statutes do not provide an adequate statutory remedy for the breach of these statutes. Since the criminal statutes do not provide an adequate statutory remedy, OMI reasons, this court does not need an explicit statutory authorization to allow OMI to recover the familiar common-law remedy of damages in order to enforce Howell's statutory obligation. According to OMI, civil liability is appropriate to effectuate the language and purpose of the criminal embracery statutes. As such, OMI contends that the existence of criminal embracery statutes should not deprive those injured by improper juror contacts from compensation through a common-law embracery tort.

OMI is correct in that the mere existence of a criminal statute does not preclude a civil action. However, there is a problem with OMI's reasoning. To use civil liability as a way to enforce a statutory duty without specific statutory authorization, the statute must fail

to provide an adequate statutory remedy for its breach. The federal and state embracery statutes provide criminal sanctions for violation of the statute. Based on a balancing of the interests between deterring improper juror contact, encouraging witness testimony, and preventing duplicative litigation, these criminal sanctions provided by the statutes are adequate to effectuate the language and purpose of the statutes.

Next, OMI addresses the existence of other court sanctions which punish improper juror contacts, contending that these sanctions do not preclude the recognition of an embracery tort. OMI argues that these other court sanctions are used by the court to insure order within the court system but that the sanctions are not intended to compensate anyone. For instance, contempt proceedings punish the witness for improper juror contact, while mistrials and new trials repair the prejudice which might have occurred from the juror contact. However, none of these remedies compensate the adverse party for lost effort and expense due to improper juror contact and a subsequent mistrial. Thus, OMI reasons that the other court sanctions for jury tampering should not preclude a tort action to compensate the party injured by improper conduct. Instead, any money recovered by the harmed party through the court's contempt power should simply be set off against the damages claimed in the tort action; they should not bar the tort claim altogether. See *LaBarre* v. *Payne,* 174 Ga. App. 32, 329 S.E.2d 533 (1985); *Employers Insurance v. Hall,* 49 N.C. App. 179, 270 S.E. 2d 617 (1980) (plaintiff's embracery tort actions for civil damages were not precluded by the existence of a criminal embracery statute or the existence of court sanctions in the underlying action).

We think the current court remedies for jury tampering are adequate; thus, the recognition of an embracery tort is not necessary. While mistrials and new trials are not compensatory, the legislature and the courts seem to agree that compensatory remedies are not always necessary. See K.S.A. 21-3815; *Hokanson* v. *Lichtor,* 5 Kan. App. 2d 802, 810-11, 626 P.2d 214 (1981) (refusing to recognize a tort for perjury, stating: "If perjury is committed in a tort, a litigant is not left helpless; procedure is available to obtain a new trial. Criminal penalties are available against the perjurers and those who

engage in a conspiracy to commit perjury. Disciplinary rules are available to punish lawyers who engage in such reprehensible conduct.") Further, fee petition and contempt proceedings are compensatory remedies.

### Absence of Civil Statute

In refusing to recognize an embracery tort, the federal district court stated:

"We acknowledge that defendant had a duty not to make contact with jurors outside of open court. But, plaintiff has not argued that this duty, as codified in the Kansas and federal criminal statutes, creates a private right of action. Nor do we believe a private right of action can be based on the criminal statutes or any court rule."

Howell also argues in his brief that the federal criminal embracery statute, not the state criminal embracery statute, applies to his conduct and that a private civil right of action for damages does not arise out of this federal statute.

OMI points out, however, that its cause of action is not based on an implied right of action arising from any statute. Instead, the plaintiff contends that Kansas should recognize a tort action for embracery arising out of the common law.

Several federal cases have found that an embracery cause of action cannot be brought as an implied right of action under the federal embracery statute. *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123 (10th Cir. 1953). However, the district court found that Kansas substantive law should apply, both statutory law and common law. In order for this court to recognize a civil embracery action, it does not need to arise as an implied right of action from an existing statute. Instead, if this court should recognize an embracery tort, the court should recognize the action as arising from the general body of law in Kansas known as the common law. See *Mainelli v. Providence Journal Company*, 207 F. Supp. 453 (D.R.I. 1962), *aff'd in part and vacated in part on other grounds* 312 F.2d 3 (1st Cir. 1962) (finding that while 18 U.S.C. § 1503, which prohibits jury tampering, does not create a federal cause of action for civil damages, a cause of action for civil damages may still exist under state law from statute or common law). Thus, it is irrelevant

that Kansas does not have a civil statute prohibiting juror contacts or a criminal law from which an implied right of embracery could arise. An embracery tort could arise simply from the common law. We hold it does not.

## Calculation of Damages

Finally, one of the policy concerns which prevented the federal district court from recognizing an embracery tort was that, just as in *Koplin*, it found it would be difficult to calculate the damages which the tort had caused. The court found that if a mistrial was granted, it would be difficult to determine the amount of time and effort OMI had spent at the first trial which would be valuable in the second trial as opposed to the time and effort from the first trial that was totally wasted. Further, the court reasoned that OMI may have even benefitted from the mistrial because it became aware of its adversary's trial strategy. Thus, it would be impossible to tell how much money had been wasted due to the mistrial.

OMI concedes that it may require some care for a jury to award damages which reflect only the time and effort actually wasted at the mistrial. However, OMI reasons that this determination is not any more difficult than the damage decisions which juries are called on to make each day. In fact, OMI contends that this particular embracery action presents a far easier damage calculation than most tort actions because the damages include all the actual expenses incurred in presenting the first trial. OMI contends that it should be compensated for all of the money which it spent on the first trial because none of the preparation on the first trial was valuable at the second trial. OMI points out that the trials involved complex, fact-specific issues of patent law. Due to the 4-month delay between the mistrial and the start of the second trial, OMI contends that it needed to "essentially reinvent the wheel to prepare for retrial." Thus, according to OMI, all of the time and effort expended at the mistrial was wasted and did not mitigate the expenses incurred in preparing for the second trial.

OMI also rebuts the district court's contention that it may have benefitted from mistrial by becoming aware of its opponent's trial strategy. In fact, OMI contends that the only party who could have

benefitted from the mistrial was the adverse party, who hired Howell, because the mistrial gave this party a dress rehearsal for its case in chief. As such, the adverse party had an opportunity to better prepare its witnesses for cross-examination and to alter its presentation of the case for the second trial. Thus, OMI contends that its damages for the embracery tort should not be reduced by any benefit which it might have gained from the mistrial, such as preparation or knowledge of opponent's strategy, because it did not gain such a benefit. OMI contends that its damages will be very easy to determine—the money it spent on the mistrial—and that the policy consideration of difficulty in determining damages is not implicated here and should not prevent the recognition of the embracery tort.

It appears to this court that the damages for the embracery tort would be difficult to calculate. Further, even if OMI's damages under these particular facts would be easy to determine, this would not be the case for all plaintiffs who bring an embracery tort action. When deciding whether to recognize a new tort, this court should take into account the circumstances of all potential plaintiffs. The damages of most plaintiffs for the tort of embracery will be very difficult to calculate because they will have gained preparation and knowledge of the opponent's trial strategy from the first trial. Thus, the difficulty in determining damages for an embracery tort is a policy concern which weighs against recognition of the tort. See *Bruggeman v. Schimke*, 239 Kan. 245, 718 P.2d 635 (1986) (refusing to recognize a cause of action for wrongful life because, *inter alia*, it would be too difficult to measure damages—the court must set off any special benefits to the plaintiff, such as life, resulting from defendant's negligence in genetic counseling).

## II. NEGLIGENCE

Negligence is the lack of due care which a reasonable person would exercise given a particular set of circumstances. *Rowell v. Wichita*, 162 Kan. 294, 300, 176 P.2d 590 (1947); see *Blackmore v. Auer*, 187 Kan. 434, 440, 357 P.2d 765 (1960) ("It may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vig-

ilance which the circumstances justly demand, as a result of which such other person suffers injury.").

To prevail under a negligence action, OMI must prove that Howell owed a duty to it, that Howell breached this duty, and that such breach proximately caused injury to OMI. See *Rowell*, 162 Kan. at 300. OMI alleges that Howell owed a duty to it to exercise reasonable care in avoiding improper contact with the jurors and that Howell was aware of this duty. OMI contends that Howell breached this duty by engaging in improper contacts with the jurors and that this breach proximately caused OMI to be injured in the form of legal expenses wasted on the mistrial.

According to the district court, OMI's negligence claim is an effort to allege negligent embracery. The court found that this was a paradoxical concept because embracery requires the willful effort to influence a juror and cannot be committed without wrongful intent. Howell agrees with the district court, contending that if one does not intend to improperly influence a juror, then one's conduct cannot amount to embracery. According to the defendant, it is impossible to negligently attempt to influence jurors.

OMI rebuts the district court's position. OMI points out that this action is based on simple negligence, not embracery or negligent embracery. Under this negligence action, OMI seeks to recover damages from Howell even if he did not intend to influence the jurors' decision. OMI intends to prove that Howell owed a duty to OMI to refrain from improperly influencing the jurors and that Howell breached this duty, proximately causing injury to OMI.

We agree. Intent is irrelevant in the simple negligence analysis. There are numerous circumstances in which if a defendant engages in certain conduct with intent, then the defendant commits an intentional tort, but if the defendant engages in the same conduct without intent, then the defendant has engaged in simple negligence, such as battery versus negligently bumping into someone. OMI is not alleging that defendant has committed negligence by engaging in the intentional tort of embracery, and a contradiction does not arise.

The district court also pointed out that Howell's conduct could not qualify as negligence unless Howell breached a duty which he

owed to OMI to act with reasonable care in communicating with the jurors. The district court acknowledged that attorneys and witnesses have a duty not to communicate with jurors. However, the district court apparently found that this duty is owed to the public and the court, but is not owed to an adverse litigant. Thus, according to the district court, a witness or an attorney does not owe damages to an adverse litigant for the breach of this duty. See *Nelson v. Miller*, 227 Kan. 271, 287, 607 P.2d 438 (1980) (attorney not liable to adversary for negligently failing to investigate claim because attorney owes exclusive duty to client); *Tappen v. Ager*, 599 F.2d 376, 378-79 (10th Cir. 1979) (no duty running from plaintiff or plaintiff's attorney to adversary to investigate or use reasonable care in filing a lawsuit because in an adversary system, a lawyer owes an exclusive duty to his or her client and the legal system).

OMI tries to distinguish *Tappen* and *Nelson*. OMI contends that these two cases are distinguishable because they were based entirely on public policy concerns which are not present here. These cases were concerned with avoiding certain deterrences which might make an attorney choose not to represent a client, thereby prohibiting free access to the courts. The courts ruled that allowing an adversary to bring suit against an attorney for professional negligence would significantly chill attorney representation and impede access to the courts. See *Tappen*, 559 F.2d at 378-79; *Nelson*, 227 Kan. at 287-88. The courts also held that an attorney's duty to his or her client is so paramount that there is not room for the existence of a duty running to an adversary. 227 Kan. at 287.

According to OMI, these public policy concerns regarding chilled attorneys, access to the court system, and an attorney's ethical duty to his or her client, upon which *Tappen* and *Nelson* are based, are not applicable to this case. Thus, permitting OMI to be compensated for Howell's improper contact with the jurors does not subvert any of these policies. OMI points out that the defendant's duty as an expert witness cannot be compared to the exclusive duty owed by an attorney to his or her client. OMI also contends that witnesses will not be deterred from testifying due to the recognition of an embracery tort because even the existence of a criminal embracery statute does not chill witnesses' testimony.

Further, even if some witnesses are chilled from testifying by an embracery tort, such deterrence is not as significant as a chilled attorney who may choose not to represent a client because access to courts is not at stake.

With *Tappen* and *Nelson* apparently distinguished, OMI argues that the defendant owed a duty to OMI to act with reasonable care. According to OMI, the principles of tort law—foreseeability of the harm which may be caused by certain conduct—imposed a duty on Howell which he owed to OMI to not engage in unreasonable conduct. In support of this argument, OMI cites *Durflinger v. Artiles*, 234 Kan. 484, 489, 673 P.2d 86 (1983), which states:

"An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation*; it is the risk to another or to other within the range of apprehension. [Citation omitted.] The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based."

According to OMI, Howell owed a duty to refrain from improper contact with the jurors because Howell could foresee the harm which the improper juror contact would cause to OMI, including the expense of mistrial. Howell could foresee the harm his conduct would cause because he was an attorney who had been practicing law for over 26 years. Howell also should have known that his contact with the jurors violated the ethical rules prohibiting contact between attorneys and jurors and that violation of such rules was likely to result in a mistrial. Further, Howell knew that if a mistrial was declared, OMI's efforts in preparing for the first trial would be wasted, and Howell also knew how expensive it is to participate in a trial. Thus, OMI contends that Howell could plainly foresee his improper contacts with the jurors would result in harm to OMI. According to the OMI, the foreseeability of the harm imposed a duty on Howell which he owed to OMI to not engage in improper contacts with the jurors. See *Ceretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 351, 837 P.2d 330 (1992) ("[T]he test of negligence . . . is not whether the [defendant] should have anticipated the particular act from which the injury resulted, but

whether it should have foreseen the probability that injury might result . . . .") (citing *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, 695-96, 339 P.2d 702 (1959).

OMI also contends that there are not any public policy problems in finding that Howell owed a duty to OMI. According to OMI, a witness' conduct off the stand, such as communication with jurors during trial breaks, is not entitled to special protection. Further, OMI contends that improper contacts with the jurors is an act which so harms the administration of justice that it should be deterred by every means available. Based on the foreseeability principle of tort law and the lack of public policy concerns militating against it, OMI contends that Howell owed a duty to OMI to not engage in improper contact with the jurors.

OMI contends that Howell owed the same duty to OMI as he owed to the party who hired him—the duty to exercise reasonable care as a participant in the trial process. Thus, OMI contends that Howell owed a duty to it to use reasonable care to avoid contact with jurors. The defendant breached this duty, proximately causing OMI to waste legal expenses spent on the first trial. As such, OMI contends that Kansas law should recognize an action for negligence under these circumstances.

It is hard to disagree with the concept that foreseeability of harm by a defendant can impose a duty on the defendant, owing to the injured party, not to engage in conduct which might cause the harm. However, the fact that a duty *may* arise from the foreseeability of harm does not always mean that such duty actually arises. A court may choose not to recognize the duty if the duty goes against public policy. See *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985) (recognizing that the serving of liquor to a minor or an inebriated person may initiate a foreseeable chain of events but still refusing to hold the tavern owner liable for negligence due to public policy concerns). This is the case here. Imposing a duty on the defendant, which he owes to OMI, not to engage in improper juror contacts is against public policy because it places an intolerable burden on all witnesses and may deter witnesses from testifying. Thus, just because Howell might have foreseen the harm

his actions would cause, this does not mean he can be sued for such conduct.

OMI also contends that even if the common law did not impose a duty on Howell, the criminal embracery statute imposed a duty on Howell, which he owed to OMI, not to contact the jurors. OMI points out that criminal statutes often impose a duty to refrain from certain conduct. If one violates the statute, thereby breaching the duty, then this constitutes negligence per se. As such, the breacher may be liable for damages if the breach proximately results in an injury which the statute was intended to prevent. See *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 843, 610 P.2d 1107 (1980); *Parman v. Lemmon*, 119 Kan. 323, 325-26, 244 Pac. 227 (1925); see also *Noland v. Sears, Roebuck & Co.*, 207 Kan. 72, 74-75, 483 P.2d 1029 (1971) ("It is the unquestioned rule of this jurisdiction that the breach of a duty imposed by law or ordinance constitutes negligence per se, providing a basis for recovery of damages proximately resulting therefrom.").

The elements of negligence per se are: "(1) A violation of a statute, ordinance or regulation, and (2) the violation must be the cause of the damages resulting therefrom." *Plains Transp. of Kan., Inc. v. King*, 224 Kan. 17, 25, 578 P.2d 1095 (1978). As examples of cases which have found a defendant liable based on negligence per se, OMI cites *Parman v. Lemmon*, 119 Kan. at 325-26, and *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, 804 P.2d 978 (1991).

In *Parman*, a father, in violation of a statute, provided his son with a shotgun. The plaintiff was proximately injured as a result of the son's use of the gun. The court found that this accident was precisely the type which the statute was designed to prevent. Thus, violation of the statute proximately caused injury of the type the statute was meant to protect, thereby constituting negligence per se. 119 Kan. at 325. Upon rehearing, the *Parman* court found that the son's possession of the gun was not prohibited by the statute. According to OMI, this subsequent history does not affect the theory of negligence per se which the *Parman* court analyzed.

In *Schlobohm*, the plaintiff entered a building and injured herself. She sued the owner of the building and the builder of the

entranceway under the theory of negligence per se, contending that the elevation differential between the sidewalk and the doorway violated a city ordinance. This court held that the ordinance was promulgated to protect the specific class of persons who may enter the building. Since the plaintiff was a member of this class, the defendant's violation of the ordinance was admissible evidence of negligence per se. In so holding, this court reviewed some of the basic concepts of negligence per se.

In order for the violation of a statute or ordinance to constitute negligence per se, the statute must be designed to protect a specific group of people, not just designed to protect the general public with incidental consideration given to the protection of a certain group. A statute which is clearly promulgated to provide safety and welfare for the public at large does not impose a duty on the statute violator which is owed to the person injured; thus, negligence per se is inapplicable. Further, the test to determine whether the violation of a statute may constitute negligence per se depends upon legislative intent. Legislative intent is primarily determined by the language of the statute, the purpose of the statute, and the nature of the evil the statute sought to remedy.

OMI points out that the Kansas criminal embracery statute prohibits improper communication with a juror. K.S.A. 21-3815. According to OMI, this statute was designed to protect trial participants, to uphold the integrity of the trial process, and to insure that the parties receive a fair trial. Thus, OMI contends that it was a member of the class which the statute was designed to protect. As such, the statute imposed a duty on Howell, owing to OMI, to not engage in improper contact with jurors. When Howell violated the statute, he breached his duty to OMI and proximately caused injury to OMI of the type which the statute was designed to prevent. Thus, OMI reasons that Howell is liable for negligence per se.

Howell contends that both the federal and state criminal embracery statutes create duties which he owes to the public, not to an adverse litigant. See *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123, 126-27 (10th Cir. 1953) (finding that the purpose of federal embracery statute is to protect the administration of justice;

*State v. Torline*, 215 Kan. 539, 543, 527 P.2d 994 (1974) (older version of 21-3815 had "twin goals of protecting a judicial officer in specific proceedings and to prevent the miscarriage of justice in cases which are or may be brought before such judicial officer"); *Hendrix v. Consolidated Van Lines, Inc.*, 176 Kan. 101, 110, 269 P.2d 435 (1954) (finding that jury tampering obstructs the administration of justice in a general sense).

K.S.A. 21-3815, the criminal embracery statute, states:

"(a) Attempting to influence a judicial officer is communicating with any judicial officer in relation to any matter which is or may be brought before such judge, magistrate, master or juror with intent improperly to influence such officer.

"(b) Attempting to influence a judicial officer is a severity level 9, nonperson felony."

The language of the statute indicates that the legislature did not intend for the statute to protect adverse litigants. The purpose of the statute is to protect the sanctity of the trial process, and the evil sought to be remedied by the statute is the derogation of the trial process brought about by improper juror influence. See *Torline*, 215 Kan. 539; *Hendrix*, 176 Kan. 101. The problem with OMI's negligence per se argument is that the Kansas Legislature intended for the criminal embracery statute to protect the general public and the trial process but did not intend for the statute to protect a specific group of people such as the parties to the litigation. If a witness violates this statute, the witness simply breaches a duty which it owes to the court, not to an adverse litigant. If the legislature finds that this state should recognize a negligence action for improper juror contacts, then it can enact a statute which specifically provides for such an action instead of forcing the court to base the action on a criminal statute which is designed to protect the general public and the court system, not litigants. See *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, Syl. ¶ 5, 819 P.2d 587 (1991) (finding that if the legislature had intended to grant a private right of action in K.S.A. 1990 Supp. 38-1522, the child abuse reporting statute, it would have specifically done so.).

Finally, the district court found that if a witness owed a duty to an adverse litigant and could be held liable for negligence should

the witness breach this duty, then it would be very difficult to determine damages for this negligence action. This is because under the Kansas comparative fault system, the defendant would be entitled to designate phantom parties in order to assess and apportion the fault between the defendant and any others who might have contributed to the plaintiff's damages, including the jurors, the court staff, the judge, and the adverse counsel. See *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1496 (10th Cir. 1983); *Brown v. Keill*, 224 Kan. 195, 201-07, 580 P.2d 867 (1978); K.S.A. 60-258a(c) and (d). See also *Chavez v. Markham*, 256 Kan. 859, 866, 889 P.2d 122 (1995) ("On motion of any party against whom a claim is asserted for negligence resulting in . . . economic loss, any other person whose causal negligence is claimed to have contributed to such . . . economic loss shall be joined as an additional party to the action."); *Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 782 F. Supp. 102, 103-04 (D. Kan. 1991). In the underlying case, the federal district court found that "the conversation which resulted in a mistrial was . . . partially the fault of the jurors who disregarded the [trial] court's admonitions." Thus, the federal district court found that an action for negligence based on this conduct did not exist because the damages would be too difficult to determine. The defendant agrees, contending that it would unduly intrude upon the integrity of the judicial process if a second jury in a negligence action was asked to determine the relative percentages of fault between the witness, the jurors, and the trial judge from the first trial, who may all be called as witnesses in the negligence trial.

However, OMI contends that the assessment of fault would not be a problem in this case because Howell would not be able to designate the federal judge or the jurors as phantom parties in a federal negligence action. *Mireles v. Waco*, 502 U.S. 9, 116 L. Ed. 2d 9, 112 S. Ct. 286 (1991) (judge immunity from liability); *Hefley v. Textron, Inc.*, 713 F.2d at 1497 (federal court does not have to apply Kansas comparative fault statute).

Howell concedes that the federal courts do not have to follow the Kansas comparative fault statute. However, Howell points out that this court is being asked to determine whether Kansas courts

would recognize a negligence action under these circumstances. Kansas courts must apply 60-258a. Thus, in Kansas courts, state judges and jurors may be joined as phantom parties for the purpose of allocating fault. As such, this policy concern should be considered in determining whether Kansas recognizes a negligence action based on this conduct, even if this policy concern might not affect this particular case in federal court.

However, OMI contends that even if the defendant would be able to designate judges or jurors as phantom third parties, it is irrelevant. OMI asserts that it has stated a sufficient negligence claim against the defendant and that this claim is not dependent on the practical problem of damage apportionment and phantom parties.

We disagree. The district court refused to grant OMI's fee petition because it found the mistrial was not only the fault of the defendant, but was also potentially the fault of the jurors and the judge. Thus, in any negligence action in Kansas, the defendant would be able to designate the judge and jurors as phantom parties, possibly have them testify, and have the jury apportion the fault among them, even if the judge and jurors were immune from liability. This would impose upon the integrity of the judge, the jurors, and the trial process. Based on this practical policy problem, this negligence action will not be recognized under Kansas law. The federal Court of Appeals asked whether *Kansas law* recognizes a civil cause of action for negligence under these circumstances. The answer is no.

## III. FRAUD

The federal district court also rejected OMI's claim that Howell fraudulently concealed his wrongful juror contacts from the plaintiff and the court. The court noted that nondisclosure does not constitute fraud unless the defendant has a duty to speak or disclose information and has failed to do so. *Chiarella v. United States*, 445 U.S. 222, 235, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980). The court acknowledged that a legal duty exists to avoid embracery, but it was unaware of any duty requiring a witness who commits embracery to disclose it. *Roeder v. Alpha Industries, Inc.*, 814 F.2d

22, 27-28 (1st Cir. 1987) (no duty on corporation under laws against securities fraud to disclose bribes it allegedly paid). Since Howell did not have a duty to disclose his embracery conduct, the district court held that Howell could not be held liable for fraud in failing to disclose his embracery conduct.

OMI contends that the cases cited by the district court, *Chiarella* and *Roeder*, are not applicable because the cases concern what constitutes fraudulent activity under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994). It is true that both of these cases deal with fraudulent activity under § 10(b). However, 10(b) simply prohibits fraud in the particular area of securities. Thus, the fraud rules of laws discussed in these cases apply to fraud in all other areas, such as the fact that fraud does not occur absent a duty to speak. See *Chiarella*, 445 U.S. at 234-35 ("Section 10[b] is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

In alleging that Howell is liable for fraud, OMI points to the definition of fraud found in a Kansas case, *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert denied* 482 U.S. 906 (1987), which states:

"The broad outlines of fraud are said to include any cunning, deception, or artifice used, in violation of legal or equitable duty, to circumvent, cheat, or deceive another. The forms it may assume and the means by which it may be practiced are as multifarious as human ingenuity can devise, and the courts consider it unwise or impossible to formulate an exact, definite, and all-inclusive definition of the action. It is synonymous with, or closely allied to, other terms indicating positive and intentional wrongdoing, but is distinguishable from mistake and negligence. [Citation omitted.] . . . There must be a concealment of facts which the party is under a legal or equitable duty to communicate and in respect of which he could not be innocently silent. [Citation omitted.]"

Further, *Lesser v. Neosho County Community College*, 741 F. Supp. 854, 863 (D. Kan. 1990), clarifies the elements necessary to establish fraud by concealment or silence:

"To establish fraud by silence, the plaintiff must show by clear and convincing evidence the following elements: (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered

by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff. [Citation omitted.]" *Lesser*, 741 F. Supp. at 863.

See *Tetuan v. A. H. Robins.Co.*, 241 Kan. 441, 465, 738 P.2d 1210 (1987); see also *State ex. rel. Stephan v. GAF Corp.*, 242 Kan. 152, 154-55, 747 P.2d 1326 (1987) (citing PIK Civ. 2d 14.42 for fraudulent concealment).

Under the first element enunciated in *Lesser*, Howell points out that the fraud of nondisclosure depends upon his superior knowledge of the juror contacts which he concealed from OMI. According to Howell, he did not have superior knowledge of the juror contacts because OMI had just as much knowledge regarding Howell's juror contacts as Howell did. Howell points out that the fee petition affidavits which OMI filed seeking attorney fees indicate that OMI's attorneys and employees were well aware of Howell's juror contacts despite his nondisclosure. Thus, Howell contends that the first element of fraud is not met.

However, OMI claims that the question of whether Howell had superior knowledge of the juror contacts is an issue of fact which should not be addressed by this court. In rebuttal, Howell argues that OMI does not want this court to consider the facts provided by OMI's employees in the fee petition affidavits because if the court considers the facts, then it will become clear that the fraud claim should not be recognized. Thus, Howell asks this court to consider the facts as described in OMI's fee petition affidavits to determine that he did not have superior knowledge of the jurors contacts. Howell acknowledges that appellate courts do not normally consider affidavits filed in support of a motion to dismiss unless the district court expressly considered them and gave notice to the plaintiff that it was doing so. However Howell contends that this case should be an exception. See *Wheeler v. Hurdman*, 825 F.2d 257, 259-60 (10th Cir,), *cert. denied* 484 U.S. 986 (1987) (district court properly converted motion to dismiss to motion for summary judgment because both parties submitted affidavits be-

yond the pleadings and the court properly considered them);
*Moody v. Town of Weymouth*, 805 F.2d 30, 31 (1st Cir. 1986)
(finding it proper for a court to convert a motion to dismiss to a
motion for summary judgment and consider information outside
pleadings, such as affidavits, even when the plaintiff was not given
notice of this consideration if the plaintiff had received the affi-
davits, had an opportunity to respond, and did not controvert the
accuracy of the affidavits). Further, Howell contends that even if
this court scrupulously refuses to consider the facts as stated in the
affidavits, OMI's complaint is still deficient as a matter of law be-
cause it fails to allege that OMI could not have obtained superior
knowledge of the alleged improper contacts through due diligence.

This court does not have a copy of OMI's complaint and does
not know whether OMI alleged that it could not have discovered
knowledge of the embracery conduct by due diligence. Further,
this court does not have a copy of the fee petition affidavits and
cannot use the affidavits to determine whether Howell had supe-
rior knowledge of the juror contacts. Even if this court had access
to the affidavits, this is a question of fact which this court should
not decide when analyzing a certified question. All of the cases
cited by Howell are inapplicable because this is not a motion to
dismiss which the court can convert into a motion for summary
judgment using outside information. This is a question of law re-
garding whether Kansas law would recognize a fraud action for
failure to reveal or attempting to conceal improper conduct with
juror. The first element of the fraud claim—superior knowledge of
the undisclosed material by the defendant which the plaintiff could
not discover with due diligence—is a question of fact for the federal
court to determine.

Under the second element, concerning whether the defendant
had a duty to disclose, OMI contends that such a duty may arise
in a number of ways, such as through equity or good conscience,
or when a party is in a position where his or her deliberate silence
will convey a false delusion. See 37 C.J.S. Fraud § 16; 37 Am. Jur.
2d Fraud and Deceit § 146; see also *Doe v. Johnson*, 817 F. Supp.
1382, 1389 (W.D. Mich. 1993) (defendant has duty to disclose HIV
infection to sex partner, and failure to disclose supports fraud

claim); *Cisneros v. Cisneros*, 163 Colo. 245, 251, 430 P.2d 86 (1967) (fraud action may be based on any circumstances where a material fact is concealed which in equity and good conscience should be disclosed); *Jones v. Arnold*, 359 Mo. 161, 169, 221 S.W.2d 187 (1949) (duty to disclose may arise from circumstances of case, including inequality of condition and superior knowledge of one party).

OMI contends that a duty was imposed on Howell, through equity and good conscience, to disclose to the court and OMI that he had had contact with the jurors. As OMI points out, Howell was an experienced attorney who knew that his contact with the jurors violated the court's rules and the integrity of the trial process. Further, OMI contends that participants in the trial process have a duty imposed on them to disclose any misconduct which may breach the integrity of the trial process. Thus, OMI contends that Howell owed a duty to disclose his misconduct to OMI and to the court.

OMI is mistaken. None of the cases cited by OMI support the position that a duty to disclose can be imposed merely by equity and good conscience. This argument can be immediately dispensed with because it has no authority. A party has a duty to disclose material facts if the party " 'knows that the other is about to enter into the transaction under mistake as to such facts, and that the other, because of relationship between them, the customs in trade, or other objective circumstances, would reasonably expect disclosure of such facts.' " *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan. App. 2d 546, 550, 857 P.2d 1362, *rev. denied* 253 Kan. 856 (1993). No such duty to disclose existed under these circumstances. Litigation is an adversarial process. A party may owe a duty to the court to disclose this information, but it does not owe a duty to its adversary.

In *Lewis v. Swenson*, 126 Ariz. 561, 565-66, 617 P.2d 69 (Ct. App. 1980), a woman had previously filed a medical malpractice action against a doctor. At this prior trial, an expert witness caused a mistrial by mentioning the high cost of medical malpractice insurance. The plaintiff sued the witness and the attorney for damages caused by the mistrial. The court found that even if an attor-

ney and a witness had a duty to refrain from presenting insurance information to the jury, this duty was owed to the court, not to the adverse party. In comparison, Howell contends that any duty he may have had to disclose his juror contacts was owed to the court, not to OMI; thus, he could not be liable for fraud.

OMI contends that *Lewis* is distinguishable because it did not involve a fraud claim or the duty to disclose. Further, OMI reasons that Howell's duty as a witness is not comparable to an attorney's duty and does not deserve the same type of protection in order to preserve the exclusive duty which an attorney owes to his client. In attempting to distinguish *Lewis*, OMI fails to address that *Lewis* also involved an action against an expert witness who improperly mentioned the high cost of malpractice insurance. The court found that the witness did not owe a duty to the adverse party to refrain from improper conduct. We hold that Howell did not have a duty to disclose his improper jury contacts to OMI. Any duty to disclose which Howell might have had was owed to the court.

Under element three, OMI contends that Howell breached his duty to disclose because he did not tell OMI or the court that he had engaged in improper juror contacts. Since Howell did not have a duty to disclose to OMI, he could not have breached this duty so as to be liable to OMI.

Under element four, OMI contends that even if Howell's duty to disclose is only owed to the court, this duty and breach, and the court's justifiable reliance on Howell's nondisclosure can be imputed to OMI. OMI contends that a trial court justifiably relies on the participants in a trial to refrain from engaging in improper juror contact. Further, the litigants in a trial justifiably rely on the court to safeguard their right to fair trial and bring any misconduct affecting the trial to their attention. Since the trial court justifiably relied on Howell's concealment of his juror contacts, then, according to OMI, this justifiable reliance should be imputed to OMI because it justifiably relied on the district court to safeguard its right to a fair trial. Thus, OMI contends that it justifiably relied on Howell's failure to disclose. See *Tetuan*, 241 Kan. at 464-65 (physician justifiably relied on manufacturer's failure to disclose problems with ethical product and patient justifiably relied on physi-

cian's failure to warn, so physician's justifiable reliance on manufacturer was imputed to patient, making manufacturer liable to patient for fraud.)

OMI's cite to *Tetuan* to support its justifiable reliance on the defendant's nondisclosure as imputed through the court is misplaced. In *Tetuan*, the imputed justifiable reliance theory was used because the defendant failed to disclose information to a doctor or learned intermediary about an ethical product; thus, the doctor could not properly inform the patient of the product risks, as a doctor is required to do. As the *Tetuan* court points out, a patient places primary reliance upon a doctor instead of upon the manufacturer of an ethical product because the manufacturer may have a difficult time directly communicating with a patient. Thus, this court held that "where a patient relies on a physician for treatment or advice as to an ethical or prescription device, justifiable reliance by the physician on misrepresentations or concealment by the manufacturer of that device constitutes justifiable reliance by the patient." 241 Kan. at 464.

Comparatively, the witness in this case was not able to directly communicate with the adverse litigant and the litigant may have placed primary reliance on the court, rather than the adverse litigant, to disclose information. However, an ethical product or learned intermediary was not involved. The relationship between participants in litigation is not comparable to the relationship between a manufacturer, a doctor, and a patient. Thus, OMI did not justifiably rely on Howell's nondisclosure, and element four is not met.

We hold a fraud claim should not be recognized because the defendant did not have a duty to disclose its juror contacts to OMI. The defendant may have had a duty to disclose to the court, but this duty and the court's reliance on the defendant's nondisclosure cannot be imputed to OMI as it was in *Tetuan*.

In *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App. 2d 461, 465, 701 P.2d 977, *rev. denied* 238 Kan. 877 (1985), the Court of Appeals stated:

"[The counterclaimant] was in much the same position that any party to a suit is in when he or she believes an adverse witness is not being truthful or is giving

an inaccurate and biased expert opinion. One has expended time, effort and money, and has suffered anxiety while being forced to defend a claim one knows is untrue. [Citation omitted.] [The counterclaimant's] remedy, if any, is not an action for fraudulent misrepresentation."

Here, OMI was in the same position as any party to a suit where the adverse party or one of the adverse party's witnesses causes a mistrial. OMI has expended time, effort, and money on a wasted mistrial. However, OMI's remedy is not an action for fraud. The answer to the three certified questions is no.